## MARKS v. UNITED STATES.
### No. 45702.

Court of Claims.
Dec. 4, 1944.

Allen Trafford Klots, of New York City (G. Herbert Semler, Edward S. Hand, and Winthrop, Stimson, Putnam & Roberts, on the briefs), for plaintiff.

J. H. Sheppard, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the briefs), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

Plaintiff sues to recover $94,973.33 alleged to have been an overpayment of income taxes for the year 1936. In making his return for this year he claimed no deduction on account of a loss alleged to have been sustained in the participating preference stock in the International Match Corporation, but subsequently he filed a claim for refund therefor, alleging that in the year 1936 this stock had become worthless and that in that year he had lost his entire investment in it amounting to $141,-562.50. The defendant says the stock became worthless in a year other than 1936.

The International Match Corporation was a subsidiary of the Swedish Match Company, which in turn was owned by A/B Kreuger & Toll. A/B Kreuger & Toll was owned and controlled by Ivar Kreuger.

Ivar Kreuger shot himself and died on March 12, 1932. This caused an investigation of the affairs of the companies he controlled. About a month after his death, on April 13, 1932, a creditor's bill was filed in the District Court for the United States for the Southern District of New York, praying for the appointment of a receiver for the International Match Corporation. Less than a week later this company filed a voluntary petition in bankruptcy and was adjudicated a bankrupt. The Irving Trust Company was appointed as trustee.

According to the first tentative report of the receiver the books of this company showed total assets of $197,014,587.88, and total liabilities, exclusive of capital and surplus, of $105,444,014.43. Many of the assets listed, however, were grossly overvalued and some were purely fictitious. For instance, among the assets carried on the books was one of $15,716,166.66, an advance to N. V. Financiele Maatschappij Garanta. Apparently this corporation was organized merely as a cloak for some of Kreuger's activities; it had no office or place of business and no assets, except a small bank balance and a claim against Kreuger, which was absolutely worthless. Another asset listed was one of $74,739,-582.91, an advance to Continental Investment A/G, one of the Kreuger companies. Included among the $35,103,048.10 representing investments in constituent companies was an item of $21,489,422.16 representing the company's stock holdings in the Continental Investment A/G. The books of the Continental showed total assets of $201,373,164.78, which was several million dollars in excess of its liabilities, but included among the assets were two items which were wholly fictitious. One was $27,830,600 "Spanish suspense," and another was $102,000,500.00 representing "£21,000,000.0.0 'Italian' 6% bonds." These items did not exist. Another asset carried on the books was $46,500,000 of German Reich 6% External Loan Bonds of 1930, plus interest. These had been misappropriated by Kreuger and pledged with Swedish banks to secure his own indebtedness and that of some of his companies on which he was indorser.

The affairs of the International Match Corporation and its affiliated companies were in a state of the utmost confusion, but in 1932 it was quite apparent to all who had any knowledge of the situation that there was every probability that the assets of the company would be insufficient to pay its debts and that its stock was, therefore, without value. For instance, the protective committee for the preference stockholders informed these stockholders on October 7, 1932, that the investigation of the affairs of the International Match Corporation and its affiliates "will probably show that International Match Corporation's liabilities are substantially in excess of its assets." The lawyer and public accountant who represented the trustee in bankruptcy testified that in 1932 it appeared that the assets would lack about $30,000,000 of paying the debenture holders. Further investigation of the affairs of this company finally disclosed that its liabilities were some $61,-000,000 in excess of its assets.

Whatever may have been thought of the value of the stock in this company in 1932, subsequent events proved it to be in fact worthless in that year.

It is, of course, true that stock which is in fact worthless may have a value on the market, and, if so, cannot be said to be worthless for income tax purposes. The market value of the International stock had fluctuated greatly prior to Kreuger's death. In 1925 it sold for a high of $60⅞; in 1926 at $66⅞; in 1927 at $95½; in 1928, $121⅞; in 1929, $102½; in 1930, $92; in 1931, $73¼; in January, 1932, $24⅝; in March, 1932, $21¼. After Kreuger's death it dropped from $21¼ to ⅝ during the month of April, and in the month of May it sold at a high of ⅝ and a low of ¼. In that month it was struck from the board of the New York Stock Ex-

change. Thereafter, in the year 1932, this stock was sold "over the counter" at prices ranging from a high of 62½ cents to a low of 12½ cents, but there were sales at auction for prices as low as 1 cent. The highest price realized at any auction sale was 3.61 cents, except for one sale of 25 shares, which brought 24 cents a share. From 1932 to 1935 the highest price at which any of this stock was sold "over the counter" was 27½ cents. In 1936 it sold at prices ranging from 10 cents to 65 cents. In 1937 there were two sales at 5 cents a share.

It will be seen, therefore, that the market fairly accurately reflected the true condition of the financial affairs of this company. A market which dropped from $21¼ to 12½ cents, and in some instances to even less than this, demonstrates almost complete lack of confidence in the value of this stock. One who paid 12½ cents could have had but a most remote hope of ever realizing anything on the stock. He must have known that his chances were not better than "one in a million."

Section 23 (e) of the Revenue Act of 1936, 49 Stat. 1648, 1659, 26 U.S.C.A.Int. Rev.Code, § 23(e), provides for the deduction from gross income of an individual of "losses sustained during the taxable year and not compensated for by insurance or otherwise." Article 23 (e)–4 of Regulations 94, promulgated under this Act, prohibits a deduction of "shrinkage in value" through fluctuation of the market; but this was not a "shrinkage in value" due to a fluctuation in market. It is not a case of fluctuation in the market, but one where the bottom had dropped out of the market.

■ The above cited article of Regulations 94 provides for a deduction in the "taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness." In our opinion, where a taxpayer shows that the dominant figure in the corporation in which he owns stock has committed suicide, and that this is followed by the filing of a voluntary petition in bankruptcy by this corporation, and that an examination of the books of the corporation shows that there was carried thereon assets at grossly exaggerated figures, and some that were purely fictitious, and that the liabilities greatly exceeded the assets, and who shows that the market value of the stock dropped from $21¼ immediately prior to the suicide to 12½

cents thereafter, and never thereafter sold for a higher price than 27½ cents, has successfully carried the burden of showing that the stock became worthless in the year in which these things happened. A taxpayer is not required, in order to show worthlessness, to exclude the remote possibility that the stock may have some slight value in the future. As the Supreme Court said, in United States v. S. S. White Dental Mfg. Company, 274 U.S. 398, 47 S.Ct. 598, 600, 71 L.Ed. 1120: "The taxing act does not require the taxpayer to be an incorrigible optimist." It was further said in that opinion: "The quoted regulations, consistently with the statute, contemplate that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment."

Sales of a stock, formerly selling as high as $121⅞, at 10 cents, or even at 65 cents, demonstrate that all hope of recoupment was gone, except in the breast of the "incorrigible optimist," or of a speculator unable to resist odds of 250 to 1.

■ But the taxpayer says there was some substantial hope of eventual recoupment on account of a certain agreement entered into between the Swedish Match Company and the International Match Corporation in 1924, just before the stock of International was offered for sale. In order to boost the sale of this stock by showing its confidence in it, the Swedish Match Company entered into an agreement with prospective purchasers of International stock, whereby it agreed, among other things, that if the International Match Corporation was unable to pay the stipulated dividends on its stock for two successive years, the Swedish Match Company would reduce its rate of dividends on its own stock to 1⅗ times the average rate of dividends paid by International Match Corporation. The taxpayer says that the protective committee, formed to protect the interests of the preference stockholders, hoped to use this agreement to get something for them. Just how they hoped to do so it is difficult to see unless they intended to make use of its nuisance value. What difference would it make to the holders of the preference stock of International whether or not the Swedish Match Company paid any dividends to its own stockholders? And if the Swedish Match Company violated the agreement and paid its stockholders more than it had promised to

pay, how were the stockholders of International Match Corporation injured thereby and, hence, what remedy did they have? It is difficult to see how this agreement added any legitimate value to International's stock.

Now it is true that this protective committee did use this agreement to get an agreement of a sort out of the Swedish Match Company. Under the agreement obtained a corporation known as Imco was formed. With it the Swedish Match Company and the Continental Match Company deposited 675,000 shares of class B stock of the Swedish Match Company, against which Imco was authorized to issue a certificate to every preference shareholder of International Match Corporation who deposited with it two shares of his preference stock. This certificate gave the preference shareholders the right to demand of Imco that one share of the Swedish Match Company should be sold on the London Stock Exchange for every certificate which he held at a price of not less than 20 Swedish kronor. Out of the proceeds of the sale of the stock 20 Swedish kronor were to be paid to the company which had deposited it, and the excess to the certificate holder. (At the time of the making of this agreement the Swedish Match Company's stock was selling at 19 Swedish kronor.)

After the consummation of this agreement there was bid for these certificates various prices ranging from 15 cents to $1.50, and the holders of them were asking prices varying from 30 cents to $2.00. By means of it, therefore, a holder of these preference shares was able to realize on his stock a sum somewhere between 7½ cents and a dollar. After its consummation these preference shares sold from 10 cents to 65 cents. It was an agreement of some, but very little, value. The taxpayer did not think it of enough value to take the trouble to turn in his stock for the certificates.

This agreement with the Swedish Match Company was entered into in 1936. In 1932 a holder of the preference shares of International in determining whether or not his stock was worthless had for consideration only the Swedish Match Company's agreement of 1924 restricting the rate of its dividends. For the reason stated above, we think this added nothing to the value of International stock, and that stock being worthless in 1932, that he had a right to deduct it as a loss in that year. If that right accrued in 1932, it could not be exercised in 1936.

Heretofore three actions have been brought claiming losses on account of the worthlessness of this stock. The first one was Marsh v. Commissioner, 38 B. T. A. 878. In this case the Board of Tax Appeals held that the stock became worthless in 1932. In Young v. Commissioner, 123 F. 2d 597, the Circuit Court of Appeals for the Second Circuit also held that it became worthless in 1932. In Clark v. Welch, a jury in the District Court for the District of Massachusetts held that this stock did not become worthless in 1936. An appeal was taken to the Circuit Court of Appeals for the First Circuit on alleged errors in the Judge's charge to the jury. The judgment below was affirmed. Clark v. Welch, 140 F.2d 271.

We are of opinion that the taxpayer in this case has not successfully borne the burden upon him of showing that the stock first became worthless in 1936.

The plaintiff in his excellent brief cites a number of cases involving the worthlessness of the stock of the Middle West Utilities Company. Those decisions are in hopeless conflict. They all depend upon the facts presented in the particular case. Under the facts of this case we are clearly of the opinion that the plaintiff has not borne the burden of showing that the stock became worthless in 1936. His petition, therefore, will be dismissed. It is so ordered.

JONES, Judge, took no part in the decision of this case.