**PARMELEE TRANSPORTATION
COMPANY**

v.

**The UNITED STATES.**

No. 69–60.

United States Court of Claims.

Oct. 15, 1965.

Laurence F. Casey, New York City, attorney of record, for plaintiff. Brown, Wood, Fuller, Caldwell & Ivey, New York City, of counsel.

David D. Rosenstein, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

LARAMORE, Judge.

In this action plaintiff claims refunds of corporate income taxes for the years 1955, 1953, and 1954. The claim is founded on a loss of an intangible asset allegedly sustained in 1955, which loss is sufficiently large to create a net operating loss for that year with carrybacks to 1953 and 1954. At issue are not only the allowability of the claimed deduction but also the proper year and amount of the deduction. Although most of the trial time and much of the argument have focused on the amount of the deduction, this issue cannot be reached

unless both deductibility questions are resolved in plaintiff's favor. We conclude that the loss is deductible, but hold that it may not be deducted in 1955.[1]

The Parmelee Transportation Company is a Delaware corporation which has its principal office in Chicago, Illinois. It was organized in 1929 to acquire a controlling interest in the shares of the Parmelee Company, similarly a Delaware corporation doing business in Chicago. In 1934, the Parmelee Company was liquidated into the Parmelee Transportation Company.

From 1853 until its liquidation, the Parmelee Company operated a transfer service among Chicago's eight railroad terminals. This service has always been an integral part of transcontinental railroad passenger traffic because few of the western railroads share terminals with the eastern railroads and, in almost every case, some transfer, even intraterminal, is required. The Parmelee Company provided an all-encompassing service. It transferred passengers and their hand baggage as well as checked-through baggage; it also performed certain local services, such as a luggage pickup and delivery service for passengers residing and stopping over in the Chicago area. Because of the specialized nature of this service, the railroads permitted only the Parmelee Company the right to perform it. With one exception, none of the railroads had any written contract with the company. Notwithstanding the informality of the arrangement, the railroads and the Parmelee Company worked together very closely. Thus, to expedite the transfer service, the railroads provided rent-free office space in the terminals and allowed Parmelee Company agents to board incoming trains at outlying stations to ready passengers for transfer. Likewise to expedite the service, the railroads issued transfer coupons to passengers with their tickets and redeemed these coupons promptly after receipt from the Parmelee Company. Coupon rates were negotiated periodically by the company and representatives of the railroads.

In the 1934 liquidation, the plaintiff, Parmelee Transportation Company, succeeded to the business of its subsidiary. This business continued in unaltered form until 1955. Throughout this period, taxpayer owned and increased its ownership in the stock of large taxicab companies in Chicago, New York City, Minneapolis, and Pittsburgh. Taxpayer also entered the airport transfer and ground transportation business with its wholly-owned subsidiary, Continental Air Transport Co., Inc., and it acquired a substantial stock interest in an insurance company. However, only the railroad transfer service was directly operated by taxpayer in 1955. All the other businesses retained their separate identities, and, unlike the railroad transfer service, were not known to the public as "Parmelee" businesses. By 1955, income from subsidiaries substantially exceeded the parent's earnings from Chicago operations; the transfer service accounted for about 6 percent of consolidated gross revenue and 12 percent of consolidated net income.

Sometime in 1954, taxpayer approached the Western Railroads Passenger Association, which then represented the railroads in transfer negotiations, with

1. Although a substantial portion of this opinion relates to the issue of whether the claimed loss is deductible under the tax laws, we stress that this is dicta only and will have no collateral estoppel effect in any other forum. Thus, defendant's inability to appeal his judgment will not preclude its reasserting the deductibility defense in a refund suit for a later year. See Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939) (distiguishable from the present case because it involves an equity decree); Restatement, Judgments §§ 68, 70 (1942); Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1, 10–15, 17–18 (1942) (comments by Professor Scott, Reporter of the Restatement, on the collateral estoppel effect of decisions of fact and law); Developments —Res Judicata, 65 Harv.L.Rev. 818, 845–846 (1952). But see, 51 Harv.L.Rev. 751 (1938).

a proposed increase in the transfer coupon rate. Thereafter, it made a different proposal, that the rate would increase in proportion to the decrease in passenger traffic. The Association formed a subcommittee to study the proposals. This group suggested that the transfer service be put up for competitive bidding. Consequently, bids were submitted by 12 companies which offered to perform the service in whole or in part. Only the Parmelee Transportation Company and Railroad Transfer Service, Inc. bids were seriously considered, however. Taxpayer's bid was for an annual increase over five years starting June 30, 1955, from $1.22 per adult passenger coupon to $1.25. Railroad Transfer Service, Inc., a company set up by John L. Keeshin for the express purpose of acquiring the transfer business, offered a $1.20 rate in the first year, escalating to $1.27 over five years. Railroad Transfer also offered to provide new equipment and to give the railroads periodic accounting statements.

Not satisfied with competitive bidding, Keeshin approached Hugh W. Cross, a longtime friend and then Chairman of the Interstate Commerce Commission. Cross discussed the transfer service negotiations with the presidents of some of the interested railroads and, in at least one discussion, stressed the merits of the Railroad Transfer proposal. S.Rep. No. 1444, 84th Cong., 2d sess. 28, 30–31 (1956). It is not clear whether Cross interceded simply as a personal favor to an old friend or whether he was influenced by a job offer. Before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations, both Keeshin and Cross denied the latter allegation which taxpayer made there and in an anti-trust action. Parmelee Transportation Co. v. Keeshin, 186 F.Supp. 533 (N.D.Ill.1960), aff'd, 292 F.2d 794 (7th Cir.), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed. 2d 340 (1961). Likewise, it is not clear whether Cross' intercession was the deciding factor for the railroads. It is clear, however, that public exposure of the incident and all the natural inferences caused Cross to admit that he had been "indiscreet" and resign from the Commission chairmanship.

On June 13, 1955, the railroads informed the taxpayer that after September 30, 1955, its services would no longer be required. The railroads, acting through the Western Railroads Passenger Association, signed a 5-year contract with Railroad Transfer Service, Inc., providing that Railroad Transfer would furnish a complete transfer service. This was exactly the same service which taxpayer and its predecessors had performed since 1853.

After September 30, 1955, taxpayer's agents were not permitted to enter any railroad terminals. Nor would the railroads cooperate to allow the transfer of checked-through baggage. Thus, although taxpayer attempted briefly to perform transfer functions at no charge, as a practical matter, it was completely excluded from the business. The natural consequence was that about 60 percent of the drivers resigned to go with Railroad Transfer, and the remaining transfer business employees retired or shifted over to Continental Air Transport. By December 31, 1955, the transfer business was in effect being wound up. This was so, even though most of the equipment had not yet been sold and many transfer business employees had not yet relocated. The revenue dried up abruptly on September 30, 1955; the expenses lingered on only because the tangible assets could not be sold overnight, nor could the employees be fairly discharged on the spot.

Before December 31, 1955, the Parmelee Transportation Company balance sheet carried an asset entitled "Intangible Assets" in the amount of $1,322,819.-05. This represented the excess book value of the Chicago transfer business over its tangible assets in 1934, the year of the Parmelee Company liquidation into taxpayer. This asset was eliminated from the balance sheet on December 31, 1955. It is this item that taxpayer claims is an allowable ordinary loss deduction in 1955.

The applicable statutory provision is section 165 of the Internal Revenue Code of 1954, which provides in subsection (a):[2]

> There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

Taxpayer contends that its loss of these intangible assets, or at least of the exclusive arrangements with the railroads, falls within the purview of this section. The defendant answers with extremely thorough and ingenious arguments. We agree with taxpayer that the loss of the intangible assets is deductible and note that, although the loss is of a capital asset, there is ordinary loss treatment for want of a sale or exchange. Internal Revenue Code of 1954, sections 165(f), 1221.

The gist of defendant's first argument is that the "arrangements with the railroads" were not "property" for purposes of section 1221 of the Internal Revenue Code of 1954. Defendant emphasizes that in 1934, when taxpayer acquired the transfer business from its subsidiary, it had a mere expectancy that the railroads would continue the exclusive arrangements. Unlike franchises, patents or licenses, these arrangements could be granted only by the railroads and were not readily assignable. The argument continues that although the Parmelee Company transfer business had a *going concern* value in excess of its tangible assets, this "goodwill" factor could be attributed to name, equipment, location, reputation, drivers, agents, executives with experience, and so forth. The arrangements, defendant contends, although possibly having a value, should not be considered a part of the goodwill because they could be granted only by the railroads and at no cost.

The difficulty with defendant's argument is that it fails to take account both of the breadth of the concept of "property" within the framework of the tax laws and of the realities of the transfer business. It cannot be convincingly argued that the terminable-at-will arrangements represented but a minor ingredient of the intangible asset value of the Parmelee Company business. Surely the arrangements constituted substantially the entire intangible asset value and were the *sine qua non* of the Chicago railroad transfer business. Granted, the arrangements were not technically assignable, and the railroads could terminate for any reason. However, the historical relationship dating back to 1853 made it less likely each year that there would be any termination. There can be no doubt that the arrangements had a substantial value in 1934 and that this value was transferred in the liquidation of the subsidiary into the parent. Defendant's view of the facts is unduly formalistic. It was of no concern to the railroads whether Parmelee Transportation Company or its subsidiary Parmelee Company performed the services. Thus the arrangements passed as a part of the business to the acquiring parent corporation from the subsidiary and not from the railroads.

We think that this construction of the facts and of the meaning of "property" under the Internal Revenue Code of 1954 is not inconsistent with the cases cited by the defendant. In Consolidated Freight Lines v. Commissioner, 101 F.2d 813 (9th Cir.), cert. denied, 308 U.S. 562, 60 S.Ct. 73, 84 L.Ed. 472 (1939), the taxpayer acquired certificates of convenience and necessity to operate trucks in the State of Washington. The cost far exceeded the annual state fee. When the state abolished the licensing system thereby

2. Under section 165(b) of the 1954 Internal Revenue Code, the amount of the loss is the difference between the adjusted basis and the amount realized, or zero in the case of abandonment or condemnation without compensation. Internal Revenue Code of 1954, §§ 1001, 1011, 1012. The

defendant argues that the part of intangible assets allocable to the arrangements with the railroads has no basis, but agrees that if it does, it is the fair market value at the time of the liquidation of the Parmelee Company.

stimulating competition, the taxpayer sought to deduct the purchase price of the then worthless license. In Chase Candy Co. v. United States, 126 F.Supp. 521, 130 Ct.Cl. 102 (1954), the taxpayer paid a substantial premium for the stock of a sugar company which had a large sugar allotment. The taxpayer hoped that the Office of Price Administration would consent to the transfer of this sugar ration. When the rationing system ended, so did the monopoly conditions, and taxpayer sought to deduct the premium. In both cases, the government prevailed. The basis of the court's holding in Consolidated Freight Lines was that the certificates of convenience and necessity conferred no monopoly privilege. The existence of a monopoly depended solely upon the administration of the licensing law by a state agency. There was nothing the taxpayer could do to prevent the agency from issuing certificates to all applicants or the legislature from abolishing the system. This court adopted a similar analysis in Chase Candy.

 While we recognize the possible analogy between these cases and the present, we think there are fundamental differences. Both those cases involved attempts by taxpayers to assert the existence of a property right in a state-created monopoly. There can be little doubt that no person has a vested interest in a public law which entitles him to insist that it not be changed.[3] See New York Central R. R. Co. v. White, 243 U.S. 188, 198–202, 37 S.Ct. 247, 61 L.Ed. 667 (1917). Taxpayer in this case makes no such assertion, however. It recognizes that it had no "right" to a

monopoly, but contends that it had an expectancy in the continuation of the arrangements, a not unreasonable. expectancy in the light of its century-long relationship. This is a very different kind of expectancy from that created by a public law. It is the kind of expectancy that comes close to being a property right, and it is considered "property" for tax purposes just as other components of goodwill are "property" and capital assets. Internal Revenue Code of 1954, section 1221.

An equally significant distinction is that in Consolidated Freight Lines and Chase Candy, the aftermath of the abolition of the statutes was competition. Consolidated Freight continued to operate its trucks and Chase Candy continued to produce candy. On the facts before us, by contrast, the Parmelee Transportation Company has been completely excluded from the Chicago transfer business. It would be a very different case indeed if taxpayer were petitioning us for a loss deduction caused by the railroads giving 50 percent of the transfer business to a competitor.

 For the proposition that taxpayer had no basis for the arrangements because it acquired them at no cost from the railroads, defendant cites Miller v. United States, Ct.Cl., 331 F.2d 854, decided May 15, 1964; A. H. Morse Co. v. Commissioner, 208 F.2d 751 (1st Cir. 1953). Those cases are inapplicable to the facts of the 1934 liquidation. Both involved situations in which rights were clearly not transferable and positive action had to be taken by the grantor of the rights. We have determined that in 1934 the taxpayer simply succeeded to

---

3. This is not to say that taxpayers are not entitled to loss deductions when abolition of a statute causes a property right to become worthless. Thus, in Elston Co. to Use and Benefit of United States Brewing Co. v. United States, 21 F.Supp. 267, 86 Ct.Cl. 136 (1937), this court held that a brewery could deduct the lost value of saloon licenses which it had purchased prior to passage of the Prohibition Act of 1919 and the 18th Amendment. The facts there showed that licenses were free-

ly transferable and commanded a very high value because of their limited availability. They were recognized as property by banks, other creditors, and by trustees in bankruptcy. Without doubt, these rights became worthless with Prohibition. Note though that Elston, supra, would have been an altogether different case had the Prohibition laws not been involved, but rather had the City of Chicago issued two or three times the number of licenses—or abolished the licensing system.

the entire business of its subsidiary without having to first obtain the blessing of the railroads.

As its second defense, defendant argues that even if the arrangements were property, taxpayer has established no basis independent of goodwill. Dodge Bros. v. United States, 118 F.2d 95 (4th Cir. 1951) and Boe v. Commissioner, 307 F.2d 339 (9th Cir. 1962), are the suggested authorities. We are not persuaded by this argument. While we agree that the arrangements were a part of the general goodwill or intangible value of the transfer business, and that no specific allocation was made in 1929 or 1934, we reject the notion that goodwill is indivisible.

In Dodge Bros., taxpayer was created by investment bankers for the purpose of acquiring the automobile production business of the Dodge family. The purchase price included a substantial premium for the intangible assets of the business. The new corporation sought a depreciation or amortization deduction for that part of the intangible assets representing the value of the reputation of the "Dodge" 4-cyclinder car which had been phased out to meet demand for the 6-cylinder car. The court analyzed the problem by concentrating on the meaning of "depreciable asset." It concluded the intangible there involved was just one part of a bulk purchase of assets. This bundle, known as "goodwill," had no reasonably estimable useful life nor did its components have readily ascertainable values. For these reasons, the court applied the predecessor to section 1.167(a)–3 of Treasury Regulations (1956) which states: "No deduction for depreciation is allowable with respect to goodwill."

Boe is similar to Dodge. The taxpayer, a doctor, purchased a retiring doctor's practice. The bulk of the purchase price was allocated to goodwill which included the value of medical service contracts. The court denied the taxpayer a deduction under section 165 of the Internal Revenue Code of 1954 for the losses realized on termination of some of the contracts. The court reasoned that the contracts were part of the goodwill of the practice or business, and that the termination of some was not a proper event for loss recognition because they were gradually replaced by others.

We find neither Dodge nor Boe particularly helpful. The present case is very different from those, because in both, the businesses and the goodwill carried on. The Dodge Company continued to manufacture automobiles and Boe continued to provide medical services. By contrast, the Parmelee Transportation Company ceased to be a meaningful factor in the Chicago railroad transfer service business in 1955. Although the company continued, it did so without a former line of business.

Support is given to this analysis by section 39.23(e)–3(a) of Treasury Regulations 118, which was in effect during 1955. The relevant part of that provision states:

§ 39.23(e)–3 *Loss of useful value*

(a) When, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action * *.

This is a proper interpretation of section 165 of the Internal Revenue Code of 1954. It appears to cover the case of the taxpayer engaged in more than one business and to allow a loss deduction upon the discontinuation of one line.

Of course, we are not saying that a mere decline in value of a component part of goodwill is deductible. We base our decision upon the fact that an identifiable line of business has become completely worthless. We acknowledge that perhaps it will be the rare case whose facts permit this result and that we would have less difficulty were a subsidiary corporation involved. But we do not think that a difference in organizational form alone should dictate a dif-

ferent result, where, as here, the loss is very real and complete.

■ Taxpayer has cited Webster Investors, Inc. v. Commissioner, 291 F.2d 192 (2d Cir. 1961), to support its contention that a deduction is allowable without the loss of the entire goodwill. Cf., Strauss v. United States, 199 F. Supp. 845 (W.D.La.1961); Metropolitan Laundry Co. v. United States, 100 F. Supp. 803 (N.D.Calif.1951). In Webster the taxpayer sought to deduct a loss realized at the time of the sale of a brand name. The loss was allowed. This illustrates that upon the sale, exchange, abandonment, or condemnation of a readily identifiable intangible, a loss is properly allowable. Doubtless a brand name is a more salable commodity than a terminable-at-will contract, but that fact in no way diminishes the reality that such arrangements as are before us are analogous to brand names and trademarks and may be very valuable though of limited marketability.

■ Closely related to its argument that no independent basis can be established for a component of goodwill is defendant's third and principal argument that the taxpayer has not sustained a deductible loss of goodwill or intangible assets because it remained in business after the termination of the transfer arrangements. At the heart of this contention is the notion that taxpayer has not "sustained" a loss under section 165 of the Internal Revenue Code of 1954. The theory is that taxpayer realized a loss of that part of the goodwill that attached to the railroad transfer operations, but it cannot recognize this loss for tax purposes as long as its other operations and the general goodwill of the overall business continue. We agree with the defendant that as a general proposition of tax law loss recognition requires a "closed transaction." As goodwill is typically part of a going concern, a loss of a part of goodwill will not be a closed transaction; only the termination or sale of the underlying business will qualify. See Zwetchkenbaum v. Commissioner, 326 F.2d 477 (1st Cir.

1964); Dodge Bros. v. United States, 118 F.2d 95 (4th Cir. 1951). See generally, Note, Tax Treatment of Losses Incurred on the Sale or Abandonment of Purchased Goodwill, 62 Yale L.J. 640 (1953). However, there will be cases where the closed transaction rule may be applied to a loss of the goodwill of a clearly identifiable business at the time that business is terminated or sold. Strauss v. United States, 199 F.Supp. 845 (W.D.La.1961); Metropolitan Laundry Co. v. United States, 100 F.Supp. 803 (N.D.Calif.1951); Rev.Rul. 57–503, 1957–2, Cum.Bull. 139. See Anchor Cleaning Service, Inc., 22 T.C. 1029 (1954).

■ Defendant would have us reject the reasoning of these cases, or at least distinguish them. We do neither. We think that a corporation engaged in different businesses or operations may have goodwill build up around each individual business. When such a business is terminated, the goodwill may vanish almost entirely with very little carrying over to the "parent" or "brother-sister" operations. Such is the case here. We do not accept defendant's version of the facts which stresses that the goodwill of taxpayer's Chicago transfer service division attaches to all operations of the taxpayer. Although the service in 1955 constituted a small facet of the taxpayer's overall operations, it was the only division known to the public as "Parmelee." It was not common knowledge to denizens of the railroad transfer service that they could enjoy Parmelee Transportation Company hospitality in taxicabs and airport limousines in Chicago and other cities. Quite clearly this reputation component of goodwill vanished in 1955 along with the arrangements. There are, of course, other components of goodwill. These too were rendered useless in 1955. To be sure, some of the drivers moved over to the airport transportation subsidiary and all of the executives stayed on, but as a practical matter, the valuable components of goodwill, the "Parmelee" reputation and the arrangements, were gone.

We conclude that the other components that carried over to Parmelee Transportation Company were *de minimis*. In short, we are of the opinion that the arrangements with the railroads constituted substantially the entire goodwill or intangible asset value of the railroad transfer business.

▮ Anticipating this view, defendant contends that 1955 is not the proper year because the railroad transfer activities were not permanently discontinued. It is true that taxpayer attempted to perform a kind of token service after 1955. This was, however, an empty gesture, for without the arrangements taxpayer did not have the wherewithal to remain in business. Nor did taxpayer have any reasonable hope of recapturing the lost business. Defendant refers us to Atchison, T. & S. F. R. R. Co. v. City of Chicago, 136 F.Supp. 476 (N.D.Ill.1955), rev'd, 240 F.2d 930 (7th Cir. 1957), aff'd, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958), in which taxpayer intervened. In this litigation, the railroads and the successor transfer service sought to have a Chicago licensing ordinance invalidated. Railway Transfer Service, Inc., had not applied for a license fearing it would be denied. The Supreme Court ultimately held the ordinance invalid as a restraint upon an area of interstate commerce over which the Interstate Commerce Commission had exclusive jurisdiction; but in 1955, the City of Chicago was successful. The short answer to defendant's contention is, even though the City of Chicago prevailed in 1955, there was no certainty that taxpayer would regain the service. Indeed, it seems very unlikely that the railroads would even consider application by the taxpayer after going through litigation.

Dick & Bros. Quincy Brewing Co. v. United States, 67 Ct.Cl. 505 (1929), does not compel us to hold there is no loss in 1955. There a brewer remained in business after Prohibition in 1919 to produce "near beer." This court held that the brewer had not sustained a deductible loss in the value of its goodwill in 1919 because it remained in business with some goodwill carrying over. There was lacking the necessary "identifiable event" of loss. See United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). In the present case, we expressly find that taxpayer was excluded from the railroad transfer business in 1955 and that the goodwill of *that* business disappeared with no intangible of value carrying over to taxpayer's *other* businesses. In Dick & Bros. Brewing Co., the taxpayer continued in the liquid refreshment business and the goodwill clearly had some carryover value, albeit depreciated.

▮ Strauss v. United States, 199 F.Supp. 845 (W.D.La.1961), Metropolitan Laundry Co. v. United States, 100 F. Supp. 803 (N.D.Calif.1951), Anchor Cleaning Service, Inc., 22 T.C. 1029 (1954), and Rev.Rul. 57–503, 1957–2 Cum.Bull. 139, illustrate how important the facts will be in this area of law. We have sought to set out the contours of section 165 of the Internal Revenue Code of 1954 as it applies to intangibles and to view the facts in this context, and it is our view that in this case loss treatment is justified. The courts and the Service in the cited authorities likewise appear to have reached reasonable results. We stress, though, that it will be the rare case in which the loss of an intangible, clearly a part of the goodwill of a business, or the entire goodwill of a business, can be deducted before the going concern is sold or abandoned. The burden will be on the taxpayer to establish that the loss qualifies as an identifiable event or a closed transaction under section 165 of the Internal Revenue Code of 1954.

▮ In its fourth defense, defendant assumes the claimed deduction to be allowable, but asserts that it may not be deducted in 1955. Defendant reasons that since a loss is deductible only if "sustained during the taxable year and not compensated for by insurance or otherwise" (Int.Rev.Code of 1954, section 165 (a)), there can be no deduction if there exists a reasonable prospect of recovery. This is a proper construction of the statutory rule as developed by many cases.

United States v. S. S. White Dental Mfg. Co., 61 Ct.Cl. 143 (1925), aff'd, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1937); Lewellyn v. Elec. Reduction Co., 275 U.S. 243, 48 S.Ct. 63, 72 L.Ed. 262 (1927); Juniper Inv. Co. v. United States, Ct.Cl., 338 F.2d 356, decided November 13, 1964; Minneapolis, St. P. & S. S. Marie R.R. Co. v. United States, Ct.Cl. No. 360–58, decided January 24, 1964; Wyman v. United States, 166 F.Supp. 766, 143 Ct.Cl. 846 (1958); Marks v. United States, 58 F. Supp. 182, 102 Ct.Cl. 508 (1944); Pacific Fruit Exchange v. United States, 26 F. Supp. 228, 88 Ct.Cl. 300 (1939); Montgomery v. United States, 23 F.Supp. 130, 87 Ct.Cl. 218 (1938), cert. denied, 307 U.S. 632, 59 S.Ct. 833, 83 L.Ed. 1514 (1939); Ruppert v. United States, 22 F.Supp. 428, 86 Ct.Cl. 396 (1938), cert. denied, 305 U.S. 630, 59 S.Ct. 94, 83 L.Ed. 404 (1939); Birdsboro Steel Foundry & Machine Co. v. United States, 3 F.Supp. 640, 78 Ct.Cl. 100 (1933); Scofield's Estate v. Commissioner, 266 F.2d 154 (6th Cir. 1959).

 Applying this rule to the facts of this case, we find that taxpayer has not sustained the burden of establishing that as of the close of 1955 it had no reasonable prospect of recovering the amount of its loss. Taxpayer evidently concedes in its brief that it did have a "reasonable expectation of recovery" in its antitrust suit against the railroads, Railroad Transfer Service, Inc., Keeshin and Cross. We do not find this concession determinative, however. We have reviewed the evidence concerning the antitrust suit, including the claim, answer, and the opinions, to determine what a "reasonable man" in 1955 would have determined the prospects of recovery to be. This is an objective test looking to the probabilities of the outcome of litigation as of 1955. While we offer no detailed opinion as to the merits of the taxpayer's antitrust claim or of a common law equity claim, we find that the taxpayer did have a reasonable prospect of recovering something. In arriving at this conclusion, we stress that the mere existence of a "possible" claim or pending litigation will not alone warrant postponing loss recognition. There are many reasons for initiating lawsuits. In this case, taxpayer's antitrust claim for treble damages exceeded 19 million dollars. Where the stakes are so high, a suit may be "100% justified" even though the probability of recovery is minuscule. In short, although we offer no litmus paper test of "reasonable prospect of recovery," we note that the inquiry should be directed to the probability of recovery as opposed to the mere possibility. Analyzing the rule in percentage terms, we would consider a 40 to 50 percent or better chance of recovery as being "reasonable". A lawsuit might well be justified by a 10 percent chance.

Rather than ask us to construe the facts to find no reasonable prospect of recovery in 1955, taxpayer asserts that the law prior to 1960 would allow a deduction, notwithstanding that there existed a valid claim. The nub of this argument may be found in section 1.165–1 (d) (4) of Treasury Regulations (1960). That provision states that losses antedating January 16, 1960 may be treated "in accordance with the rules then applicable, or * * * in accordance with the provisions of this paragraph." Section 1.-165–1(d) (2) (i) was added to the regulations in 1960. In other words, taxpayer argues that to give meaning to the exercise by the Commissioner of his section 7805(b) power to make regulations apply prospectively only, we must conclude that the law prior to 1960 was different. We cannot accept this interpretation.

As early as 1927, the Supreme Court, in affirming a decision of this court, set out the proper rule for determining the year of loss where there exists a claim for reimbursement. United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). There, a taxpayer claimed a loss deduction for the year 1918 during which the German Government had seized the assets of a subsidiary. In fact, taxpayer did receive some reparation in 1924. The Court focused on the year 1918 and observed that taxpayer had but a remote hope of even-

tual recovery in that year. It found the necessary closed transaction in the seizure, and viewed as irrelevant the fact of the later recoupment. Taxpayer misconstrues this part of the Supreme Court's analysis.

Consistent with the Supreme Court's analysis, this court and others have applied a test of "reasonable prospect of recovery." See White Dental and accompanying cases, supra. Thus, in Scofield's Estate v. Commissioner, 266 F.2d 154 (6th Cir. 1959), the court held that losses caused by the misconduct of trustees before 1935 were deductible by the fiduciary in 1948, the year that all litigation terminated. In that case, the government argued that the loss should have been deducted in the earlier, barred year. With respect to litigation after the claimed year of loss, the court said at 266 F.2d 154, 159:

> Normally where a taxpayer is in good faith willing to go to the trouble and expense of instituting suit to recoup a * * * [section 165(a)] type loss, there is as a matter of fact sufficient chance of at least part recovery to justify that taxpayer in deferring the claim of a loss deduction under * * * [section 165 (a)] until the litigation in question is concluded. This is not to suggest that in some cases the facts and circumstances will not show such litigation to be specious, speculative, or wholly without merit and that the taxpayer hence was not reasonable in waiting to claim the loss as a deduction.

We think this dictum proposes too rigid a test. Again, we emphasize that a suit by a taxpayer will not operate as a presumption; at the most it raises an inference which leads to an evaluation of the probabilities. The Service, however, evidently felt that Scofield's Estate either changed prior law or at least modified it. Rev.Rul. 59–388, 159–2 Cum. Bull. 76. The modified regulations resulted. T.D. 6445, 160–1 Cum.Bull. 93. Section 1.165–1(d) (2) contains nothing in-

consistent with the reasoning of White Dental. Section 1.165–1(d) (2) (ii) adds a refinement which perhaps the Service had not before applied, but it is an approach dictated by the case law. In short, we find nothing in the modified regulation to warrant a "prospective only" application, unless the Service in its review of cases had not been applying White Dental principles. So we regard section 1.165–1(d) (4) as neutral and section 1.-165–1(d) (2) as simply conforming the regulations to the White Dental decision.

In summary, we hold that the loss, though allowable, is not deductible in 1955, because taxpayer has not shown that on December 31, 1955 it did not have a reasonable prospect of recovery in the antitrust suit which was not finally adjudicated until 1961. As to what constitues the loss, we have concluded that the entire intangible assets of the Chicago transfer business vanished in 1955. That is equivalent to the value of the arrangements with the railroads which were the *sine qua non* of the business.

We reserve judgment on the amount of the loss and have accordingly made no specific finding. We have, however, reviewed the full record to compare the valuation techniques used by the witnesses, and we think the approach of plaintiff's witnesses is the better. Defendant's witnesses relied too heavily on depression earnings, on the one hand, and overvalued tangible assets, on the other. Both steps were calculated to reduce the value of the intangibles. Plaintiff's witnesses looked to an average of predepression and depression earnings. Their only error is that they should have weighted the more recent depression earnings more heavily than the boom years. See Central Trust Co. v. United States, 305 F.2d 393, 158 Ct.Cl. 504 (1962). Some weighting was accomplished by using a low price-earnings multiple, but a downward adjustment in base period earnings is needed to arrive at a realistic intangible asset value.

The plaintiff's petition is dismissed.