William E. Chandler, Jr. v. Commissioner.
Chandler v. Comm'r
Docket No. 3016-71.
United States Tax Court
T.C. Memo 1972-193; 1972 Tax Ct. Memo LEXIS 65; 31 T.C.M. (CCH) 945; T.C.M. (RIA) 72193; September 5, 1972
*65 William E. Chandler, Jr., pro se, 781 E. Miracle Strip Pkwy., Mary Esther, Fla.Frank Simmons and George W. Calvert, for the respondent. FEATHERSTON
*66 Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Additions to Tax
I.R.C. of 1954
Year
Amount
Sec. 6651(a)
Sec. 6653(a)
1962
$ 760.90
$ 190.23
$ 38.05
1964
2,775.74
863.92
172.78
1965
6,886.01
1,721.50
344.30
1966
6,340.40
1,585.10
317.02
*67 The following issues are presented for decision: (1) Whether petitioner, in 1962, sustained a deductible casualty loss under section 165(a) [1] when his household goods and personal effects were destroyed by fire; (2) Whether petitioner, in 1962, sustained a business operating loss under section 165 (a) in excess of $1,400 when the merchandise and other assets of his bookstore were sold in partial satisfaction of his unpaid tax liabilities; and (3) Whether petitioner is entitled, under section 172, to an operating loss carryover from *68 1962 to 1964, 1965, and 1966. Findings of Fact William E. Chandler, Jr. (hereinafter referred to as petitioner), was a legal resident of the State of Florida on May 5, 1971, the date on which his petition was filed. He did not file timely income tax returns for 1962, 1964, 1965, and 1966. 1. The Casualty Loss In 1962, petitioner and his family decided to move to California. On October 23 of that year, their household goods and personal effects were picked up by Aero Mayflower Transit Company, Inc. (sometimes hereinafter Mayflower) for shipment from Columbia, South Carolina, to San Francisco, California, via a van line truck. Enroute the truck and its contents were destroyed by fire. Within 20 to 30 days after the fire, in late November 1962, petitioner prepared a list of his goods which were destroyed and presented it to Mayflower in support of a claim for reimbursement. Mayflower responded that its liability was limited to 30 cents per pound in accordance with a tariff approved by the Interstate Commerce Commission. Under the position *69 taken by Mayflower, petitioner would have recovered approximately $1,860. The destroyed property had a substantially greater value. In April of 1963, petitioner filed a negligence suit against Mayflower for damages of $75,000 ($40,000 actual and $35,000 punitive damages). At the end of the trial, which occurred in 1964 or 1965, the District Judge directed a verdict for Mayflower. Petitioner took an appeal to the Court of Appeals which affirmed the District Court's judgment as to punitive damages but remanded to the District Court the issue as to actual damages. The Appellate Court's opinion is reported as Chandler v. Aero Mayflower Transit Company, 374 F. 2d 129 (C.A. 4, 1967). After the Court of Appeals handed down its opinion, petitioner and Mayflower effected a compromise settlement of the suit, and, in 1968, petitioner received $9,000 as reimbursement for his loss. Petitioner had incurred expenses of approximately $2,700 in prosecuting his claim. 2. The Business Loss In 1959, petitioner established the June Chandler Book Store (sometimes hereinafter the store) as a sole proprietorship in Columbia, South Carolina. His general objective was to attempt *70 to obtain part of the market in the State for educational and religious books, including textbooks. To promote book sales, petitioner spent a great deal of time meeting with school administrators, attending school library conventions, and talking with school officials. During the period of the operation of the store, the retail price of its books ranged from $1 to $12.95 each. The average retail price of books in the inventory in August 1962 was $6 each. The books and fixtures in the store were seized and sold in November 1962 by the Internal Revenue Service for nonpayment of taxes. At the time the store was seized, Internal Revenue Service personnel categorized and counted all of the books. At that time, the inventory consisted of 6,000 books. Petitioner owed $7,000 to publishers for books included in this inventory. After the seizure and prior to the sale, notice of the pending sale was published in a newspaper 10 to 11 days. In addition, two school districts were contacted, and each district sent a representative to the store to examine the books. The sale was held, and the highest bid for all the books and fixtures was $4,200. They were sold for this amount to the Dentsville *71 Area Schools. The records of the Internal Revenue Service indicate that petitioner had the following amounts of adjusted gross income, taxable income, and income tax liability for 1959, 1960, and 1961: Adjusted
Taxable
Income
Year
Gross Income
Income
Tax
1959
$10,297.59
$6,297.59
$1,305.47
1960
5,688.05
2,188.05
441.37
1961
6,814.22
3,132.80
626.56
Opinion Petitioner did not file timely income tax returns for 1962, 1964, 1965, and 1966, the years here in controversy, and respondent determined deficiencies and additions to tax for each of these years in the amounts set forth above. Petitioner directly challenges the correctness of respondent's determinations only for 1962, and for that year he claims adjustments only for (1) a casualty loss in connection with the destruction of his household goods and personal effects by fire, and (2) a business loss realized on the foreclosure sale of the inventory and fixtures of his bookstore. He claims the benefit of the carryover losses for the other years. 1. The Casualty Loss Section 165(a), as limited by section 165 (c)(3), allows as a deduction by an individual taxpayer "any loss sustained *72 during the taxable year and not compensated for by insurance or otherwise," including a loss which arises from fire. [2] Under section 1.165-7, Income Tax Regs., the amount of the deduction for such loss is the lesser of either (1) the amount of the fair market value of the property immediately before the casualty, reduced by the fair market value of the property immediately after the casualty, or (2) the amount of the adjusted basis in the property. The deduction is, of course, reduced by any loss reimbursement received by the taxpayer. Respondent does not deny that petitioner's household goods were completely destroyed in 1962. However, respondent contends (1) that the loss was not "sustained" in that year within the meaning of section 165(a) and, if deductible, is not allowable as a deduction until 1968, when petitioner's claim against Mayflower was settled, *73 and (2) that petitioner has not established either the fair market value of his destroyed property or his basis therein. We turn first to the question whether, within the meaning of section 165(a), the loss was "sustained" in 1962, when the fire occurred, or in 1968, when the Mayflower lawsuit was settled. In this connection, section 1.165-1(d)(2)(i), Income Tax Regs., as follows, is instructive: If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, *74 or by an abandonment of the claim. * * * In Louis Gale, 41 T.C. 269, 273-274 (1963), this Court explained that this regulation reflected an effort to conform the Treasury Department position with the reasoning of the Court of Appeals in Scofield's Estate v. Commissioner, 266 F. 2d 154 (C.A. 6, 1959). In that case, as in the instant one, the taxpayer in one year had lost his property and in a later year had settled a lawsuit in which he sought damages to compensate him for his loss. The Court of Appeals stated (266 F. 2d at 159): Normally where a taxpayer is in good faith willing to go to the trouble and expense of instituting suit to recoup a * * * [section 165(a)] type loss, there is as a matter of fact sufficient chance of at least part recovery to justify that taxpayer in deferring the claim of a loss deduction under Section * * * [165(a)] until the litigation in question is concluded. This is not to suggest that in some cases the facts and circumstances will not show such litigation to be specious, speculative, or wholly without merit and that the taxpayer hence was not reasonable in waiting to claim the loss as a deduction. However, *75 in the absence of such circumstances, a taxpayer who feels that chance of recovery is sufficiently probable to warrant bringing a suit and prosecuting it with reasonable diligence to a conclusion is normally reasonable in waiting until the termination thereof to claim a Section * * * [162(a)] deduction. See, also, Beltran v. United States, 441 F. 2d 954, 958-959 (C.A. 7, 1971); Schweitzer v. Commissioner, 376 F. 2d 30, 31 (C.A. 3, 1967), affirming per curiam a Memorandum Opinion of this Court; Harry J. Colish, 48 T.C. 711, 715-718 (1967); Parmelee Transportation Company v. United States, 173 Ct. Cl. 139, 153-157, 351 F. 2d 619, 627-629 (1965); and Commissioner v. Harwick, 184 F. 2d 835 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court. In deciding whether petitioner had "a reasonable prospect of recovery" of his loss from Mayflower, we begin with the fact that petitioner had practiced law for many years, specializing in damage suit litigation. According to his testimony, he had obtained "some outstanding verdicts * * * in the state and Federal courts, some of the largest in the history of South Carolina. *76 " He was thus well qualified to evaluate his prospects, and he testified: Q. Did you at the time you filed the suit have a personal belief you were going to win? A. I had an absolutely personal belief, I mean I would have been foolish to undertake it otherwise. At the end of 1962, he was devoting all of his time to the preparation of his claim. Even though he was faced with serious financial problems at that time, he incurred expenses of approximately $2,700 in handling the litigation. That his claim was not "specious, speculative, or wholly without merit" is demonstrated by his pursuit of the appeal of the adverse District Court judgment, the Appellate Court's remand of the case for a jury trial of the actual damage claim, and, indeed, Mayflower's payment, ultimately, of $9,000 in settlement of the claim. In view of these facts and the legal principles enunciated by the above-quoted regulation and the cited court decisions, we are compelled to conclude that, within the meaning of section 165(a), petitioner's loss was not "sustained" in 1962. The closedtransaction principle reflected by the regulation may work to the advantage of the Commissioner in one case and the *77 taxpayer in the next. It is designed to permit neither to select arbitrarily the year for which the deduction is to be allowed. We recognize the enormity of the catastrophe suffered by petitioner and his family in 1962, but the loss is not deductible until 1968. Although much of the testimony was directed toward establishing the fair market value of the destroyed property and petitioner's basis therein, we have concluded that we should not make findings on these matters. We do not think either party was fully prepared to present evidence on petitioner's basis in the destroyed property. Petitioner's evidence was limited to an estimate of the ratio of his basis to his estimate of the fair market value of the various items. Respondent's case on this point consisted solely of the cross-examination of petitioner. Since neither the fair market value of, nor petitioner's basis in, the destroyed property is essential to our decision, we think the cause of justice would best be served by leaving those matters to adjudication when and if petitioner's liability for 1968 is litigated. [3]
*78 2. The Business Loss In the notice of deficiency, respondent determined that petitioner realized a gain of $4,000 on the forced sale of his bookstore. At the trial, respondent conceded that this determination was erroneous and now contends that petitioner sustained a loss not in excess of $1,400. Petitioner computes his deductible loss at $48,387.86. Respondent arrives at his position through the following computation: Total number of books - 3,500
Average retail price - $6.00
Total retail value of all books
$21,000.00
Less 40% markup 8,400.00
Total cost of all books
$12,600.00
Less unpaid judgments for books 7,000.00
Petitioner's basis in the books
$ 5,600.00
Less amount received on the sale 4,200.00
Petitioner's loss for tax purposes
$ 1,400.00
*79 The parties agree (1) that the average retail price of the inventory was $6 per book; (2) that the retail price includes a 40-percent markup; (3) that petitioner has unpaid judgments of $7,000 against him for book purchases; and (4) that $4,200 was received by the Internal Revenue Service at the tax lien foreclosure sale. The only factual item in dispute is the number of books petitioner had on hand when the seizure was made.
A revenue officer testified that he counted the books and that there were 3,500 books in the store at the time of the seizure. Ordinarily, we would give great weight to testimony of this kind. However, since the revenue officer cast his testimony in terms of a round figure, we infer that it was an estimate. The seizure occurred nearly 10 years before the date on which he testified, and he admitted that he had made no effort to locate copies of his reports or his workpapers on the foreclosure to prepare for his testimony and that he testified from memory. We are left with the impression that there is a margin for error in his recollection of the details of the sale.
Petitioner claims that the records which he maintained on the operation of his business were never recovered after the bookstore was seized. He has taken three approaches in his effort to establish his basis in the inventory on hand at the time of the seizure. First, he testified that in August 1962, when he saw he was about to lose his store, he took an inventory with a view to trying to sell the business. From this inventory, he extrapolated a statement of the cost of the books on hand which he had acquired from each of the publishers with whom he did business. This statement reflects the cost figure totaling $59,587.86, referred to above, as of August 1962. Petitioner adjusts this cost figure to $48,387.86 as the measure of his loss. His computation assumes, as he testified, that acquisitions kept pace with sales between August and the foreclosure in November 1962.
Second, he offered the testimony of an experienced auctioneer, appraiser, and liquidator, who had made bookstore appraisals, including one recently for the Small Business Administration, and had handled numerous book liquidation auction sales. This witness testified that books do not sell well at auction sales and ordinarily bring only 3 to 10 percent of their retail price. On this basis, the books had a retail value of an amount between $140,000 and $42,000. [4]
Third, petitioner testified in detail as to the dimensions of the shelf space in his bookstore, demonstrating that it was sufficient to house 18,000 to 20,000 books. Using our best judgment in the light of all the evidence, we find that petitioner had 6,000 books on hand at the time of the seizure. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). In connection with the Rule 50 computation, the amount of petitioner's basis in the seized books will be computed accordingly. In making this computation, the undisputed adjustments to the retail value will be made in the same manner as in respondent's computation set forth above except that the $7,000 in judgments should not be eliminated from petitioner's cost basis in the books. Crane v. Commissioner, 331 U.S. 1 (1947); cf. Manuel D. Mayerson, 47 T.C. 340 (1966), *80 acq. 1969-2 C.B. xxiv; Marion A. Blake, 8 T.C. 546 (1947), acq. 1947-2 C.B. 1. 3. Loss Carryover The amount of the loss on the sale of the bookstore's assets will be used in computing the net operating loss for 1962 under section 172(c). That net operating loss is subject to carryback and carryover in the manner prescribed by section 172(b)(1) (A)(i) as follows: * * * [Subject to exceptions not material to this case] a net operating loss for any taxable year ending after December 31, 1957, shall be a net operating loss carryback to each of the 3 taxable years preceding the taxable year of such loss. As to the amounts of the carryovers, section 172(b)(2) provides: * * * [Subject to exceptions not material to this case] the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the "loss year") shall be carried to the earliest of the taxable years to which * * * such loss may be carried. The portion of the loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such *81 loss may be carried. * * * Our Findings set forth the stipulated amounts of petitioner's taxable income for 1959, 1960, and 1961, the three prior years to which his net operating loss must first be carried. The excess, if any, of the loss over and above such amounts as modified by section 172(b)(2) may then be carried to the years here in controversy. See Regs. sec. 1.172-5. The necessary calculations will be made in connection with the Rule 50 computation. To reflect the foregoing conclusions, Decision will be entered under Rule 50.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.↩
2. SEC. 165. LOSSES. * * * (c) Limitation on Losses of Individuals. -in the case of an individual, the deduction under subsection (a) shall be limited to - * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *↩
3. The record does not show whether an adjustment of petitioner's return for 1968 is barred. Cf. secs. 1311-1315. Such an adjustment would have to be made within the time period specified in sec. 1314(b).↩
4. The accepted bid of $4,200 from the Dentsville Area Schools covered both the books and fixtures of the June Chandler Book Store. The fixtures consisted of the wall shelving, several chairs, a coffee table, and other table and chairs. Due to their doubtful value and this buyer's primary interest in purchasing the books, the fixtures have been assigned no value.↩