Lorenzo A. **BELTRAN**, Plaintiff-Appellee,

v.

**UNITED STATES** of America, Defendant-Appellant.

Enrique A. and Olga P. Onetti, Plaintiffs-Appellees,

v.

**UNITED STATES** of America, Defendant-Appellant.

Nos. 18316, 18317.

United States Court of Appeals, Seventh Circuit.

April 6, 1971.

Rehearing Denied April 27, 1971.

John C. Klotsche, Baker & McKenzie, Chicago, Ill., for plaintiffs-appellees.

Before HASTINGS, Senior Circuit Judge, and KILEY and KERNER, Circuit Judges.

HASTINGS, Senior Circuit Judge.

These appeals concern two consolidated suits for refund of federal income taxes for the taxable calendar years 1962 and 1963, based on the carryover of losses from 1961. Findings of fact and conclusions of law were filed by the district court September 29, 1969.[1]

In No. 18316, taxpayer Lorenzo A. Beltran recovered judgment for $2,473.-88, principal and interest, for the years 1962 and 1963. In No. 18317, taxpayers Enrique A. and Olga P. Onetti, husband and wife, recovered judgment for $2,-245.66, principal and interest, for the years 1962 and 1963. The Government has appealed from these adverse judgments.

The pertinent facts found by the district court are not complicated and for the most part were stipulated or are not in dispute.

Beltran is a citizen of the republic of Cuba residing in Chicago, Illinois. He entered the United States at Miami, Florida on October 23, 1960 from Cuba, on a nonimmigrant visa issued at Havana, Cuba. He became a resident alien of the United States for federal income tax purposes on October 23, 1960 and has remained as such to the present time. In 1954, he purchased land in Havana at a cost of $20,337.53. The same year he constructed a building containing nine apartments on this land at a cost of not less than $130,000. The estimated useful life of his apartment house was 50 years. His cost of acquiring the land and building, less depreciation on the building through December 5, 1961, was $131,781.33. This property was held by him exclusively for rental purposes and he was engaged in the trade or business of operating rental real estate.

Johnnie M. Walters, Asst. Atty. Gen., David English Carmack, Atty., Tax Division, U. S. Department of Justice, Washington, D. C.: William J. Bauer, U. S. Atty., Chicago, Ill., Lee A. Jackson, Elmer J. Kelsey, Attys., Dept. of Justice, Washington, D. C., for defendant-appellant; James R. Thompson, U. S. Atty., of counsel.

1. Reported as Beltran v. U. S., 69–2 U.S.Tax Cas. ¶ 9649 (N.D.Ill.1969).

The Onettis are now United States citizens residing in Chicago, Illinois. They entered the United States on September 9, 1961, at Miami, Florida from Kingston, Jamaica pursuant to nonimmigrant visas. They became resident aliens of the United States for federal income tax purposes on September 9, 1961 and have remained United States residents to the present time. On July 4, 1958, they purchased land and a building thereon containing one apartment at a cost of $13,000, the house having an estimated useful life of 40 years. Their property was subject to a $5,000 mortgage, which was not paid off prior to October 14, 1960. Their cost of acquiring the land and building, less depreciation on the building through December 5, 1961, was $12,020. This property was held by them exclusively for rental purposes and they were engaged in the trade or business of operating rental real estate.

On October 14, 1960, the Cuban Government promulgated the Urban Realty Reform Law pursuant to which it intervened the rental properties owned by both taxpayers. Taxpayers transferred their rental properties located in Havana, as required, to the Cuban Government in return for compensation to be determined by a formula which took into account the age and rental value of the property. Tenants were given the right to purchase the properties for the same amount, payable in installments over a period of not less than five nor more than twenty years. The Council of Urban Reform was created to manage and maintain such rental properties and to carry out the compensation and purchase provisions of this law. Following the enactment of the law, taxpayers ceased to exercise the normal attributes of ownership and control over their rental real estate, such as the right to collect the rents directly from the tenants and the obligation to repair and maintain the premises.

Beltran became entitled to receive compensation payments of 600 pesos per month for 14 years and 4 months. The Onettis became entitled to receive compensation payments of between 58 and 60 pesos per month for 8 years and 6 months. In addition, Onettis were relieved of their obligation to pay the mortgage on their real estate. Taxpayers caused the necessary papers to be filed to receive their indemnification at an office of the National Bank of Cuba in Havana where their monthly compensation checks would be delivered and held for them. Six or seven monthly compensation checks in the above amount were issued to Enrique Onetti in Havana for the period October 14, 1960 through May, 1961. Prior to leaving Cuba in August, 1961, he returned to Havana in May, 1961 and received and cashed these checks at the National Bank of Cuba. He received and cashed similar checks at the same office for the months of May through August, 1961. Onetti did not call for, receive or cash any further monthly payments. Several monthly compensation payments of 600 pesos were issued in Beltran's name at the National Bank of Cuba, but he never claimed, received or cashed any of them.

After Beltran entered the United States on October 23, 1960, and after the Onettis entered the United States on September 9, 1961, checks continued to be issued in their names as above set out until December 5, 1961. Neither taxpayer received any of these checks after they departed from Cuba to take up permanent residence in the United States, nor did either of them return to Cuba after becoming a resident alien here. There is no evidence to show that either taxpayer could have received his compensation unless he returned to Cuba to claim it. Beltran testified he had no intention of returning to Cuba to collect his checks because he "didn't like the system." Enrique Onetti had a similar lack of intention, and testified: "When I left Cuba, I had made up my mind not to live in Cuba again as long as Castro was in power. Therefore, if they did not allow me to take any money from Cuba I was not interested in any money I could have there." Both taxpayers indicated they intended to return to Cuba if and only when the Castro government was overthrown.

On December 5, 1961, the Cuban Government promulgated "Law No. 989" which in effect confiscated and forfeited all property rights of Cubans who left Cuba and failed to return within a designated time, unless they received permission from that government to be absent. It is agreed that Law 989 extinguished the right to compensation which each of the subject taxpayers held pursuant to the Urban Realty Reform Law.

The district court made certain key findings of fact[2] and conclusions of law.[3] These give rise to the issues raised on this appeal.

I

■ The first issue presented is whether taxpayers lost property in Cuba for United States tax purposes on December 5, 1961, after they became residents of the United States, for which a deductible loss is allowed under § 165 of the 1954 Code, 26 U.S.C.A.[4]

The answer to this question turns on the determination of the time when taxpayers sustained losses by reason of the intervention and subsequent confiscation of their rental real estate by the Cuban Government. If the losses were sustained subsequent to the time taxpayers became residents of the United States for federal income tax purposes, as the district court held, such losses are properly deductible under § 165, *supra*. Conversely, if the losses were sustained prior to the time taxpayers became United States residents, no losses may be deducted.

The Government's primary contention is that taxpayers' Cuban property became worthless to them prior to the time each became a resident alien. It is

2. "43. The claims for compensation held by plaintiffs [taxpayer's] were unsecured, unliquidated, obligations of the Cuban Government, not represented by any note, bond or other evidence or indebtedness. The claims were non-transferable and personal to the former owners of the real estate.

"44. Neither Beltran nor the Onettis were at any time associated with the enemies of the Cuban government or otherwise wanted by the police. They were free to travel in and out of Cuba throughout the period in issue.

"45. Beltran and the Onettis did not intend to nor did in fact abandon their rights to the real estate or any claim for compensation they had with respect to it. Each took every reasonable step to preserve and protect his interest in the property.

"46. Beltran and the Onettis possessed, on October 14, 1960 and at all times prior to December 5, 1961, a reasonable prospect of receiving compensation of substantial value *for the losses of their rental real estate*." (Emphasis added.)

3. The conclusions may be summarized for both taxpayers as follows: (1) each taxpayer owned real estate in Cuba used in his trade or business and had an adjusted basis on December 5, 1961 of $131,-781.33 for Beltran and $12,020 for the Onettis; (2) this property was taken on October 14, 1960 pursuant to the Urban Realty Reform Law of Cuba, at which time taxpayers had a reasonable prospect of receiving compensation for it; (3) on

December 5, 1961, it was finally determined that no further compensation would be paid to taxpayers, Beltran having received none; (4) each taxpayer sustained a deductible loss in the respective amounts above set out, on December 5, 1961, pursuant to § 165(a) and (c) (1) of the 1954 Internal Revenue Code; (5) the losses were of property used in a trade or business within the meaning of § 1231; (6) such losses were a "foreign expropriation loss" within the meaning of §§ 172(k) and 172(b) (1) (D); (7) taxpayers were entitled to carry over to 1962 and 1963 such losses as net operating losses under § 172(b) (1) (D); and (8) have refund of federal income taxes paid for 1962 and 1963 as recomputed after the allowance of the net operating loss deductions arising out of such loss.

4. The relevant parts provide:
"Sec. 165, Losses.
"(a) General Rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
*      *      *      *      *
"(c) Limitation on Losses of Individuals.—In the case of an individual, the deduction under sub-section (a) shall be limited to—
(1) losses incurred in a trade or business;
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * *."

urged that they lost all practical control over their property when they left Cuba and had no reasonable prospect of regaining control, since they had to appear personally in Cuba at a designated bank to receive their indemnification and this they had no intention of doing while Castro was in power. Hence, it is argued, at the time they became resident aliens their indemnification rights were of no economic value to them, and having failed to prove a loss of value to themselves they had no allowable loss deduction for federal income tax purposes as of December 5, 1961.

Taxpayers' principal argument is that they sustained deductible losses under § 165 on December 5, 1961, the date of the enactment of Law 989, which was after they became United States residents for tax purposes. They claim that pertinent Treasury regulations make it clear that in the case of a loss with respect to which a claim for compensation or indemnification exists, the year in which the loss is sustained, i. e., the deductible year, is postponed until it can be determined whether and to what extent the claim will be paid. It is argued that, if a claim for indemnification exists with respect to which there is a reasonable prospect for recovery, the transaction is not a "closed" transaction until it can be ascertained with reasonable certainty whether and in what amount such indemnification will be received. Finally, since the findings of fact were that at all times prior to December 5, 1961, both taxpayers possessed "a reasonable prospect of receiving compensation of substantial value for the losses of their rental real estate," they should prevail on this issue.

Pursuant to the general rule in § 165(a), *supra,* a loss is deductible in the taxable year in which it is sustained. The pertinent regulation with respect to the year of deduction is to be found in § 1.165–1, Treasury Income Tax Regulations (1954 Code), 26 C.F.R.[5] It thus appears therein under paragraph (2) (i) that no portion of the loss is to be regarded as *sustained* when "there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery" until it can be ascertained "with reasonable certainty whether or not such reimbursement will be received." This is said to be "a question of fact to be determined upon an examination of all facts and circumstances." Further, under paragraph (2) (ii), in the absence of such a claim with reasonable prospect of recovery, then the loss is sustained during the taxable year in which the event occurs. The burden of proof of such questions of fact would be upon taxpayers.

5. The relevant part of § 1.165–1 reads:

\* \* \* \* \*

"(d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. \* \* \*

"(2) (i) If a casualty or other event occurs which may result in a loss and in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release.

"(ii) If in the year of the casualty or other event a portion of the loss is not covered by a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs. \* \* \* \* "

In the instant case it is evident under the Urban Realty Reform Law, on its effective date of October 14, 1960, taxpayers were completely divested of their proprietary rights in or ownership of the two rental properties and there remained no right for them to recover the properties. As such divested prior owners, they became entitled to and did receive compensation for said rental properties in the form of indemnity as hereinabove set out.

It becomes clear to us that, under the Urban Realty Reform Law, the taxpayers received a promise of compensation for their properties payable in fixed specified amounts at monthly intervals in cash at a designated bank office in Havana. This payment was made to them first as resident Cuban citizens and the right to payment remained in effect after they ceased to reside in Cuba. These were valid subsisting claims against the Cuban Government, issued pursuant to Cuban law and honored by it in the continual issuance of its monthly checks until December 5, 1961. Under all the circumstances present here, we conclude that the district court did not err in holding that taxpayers possessed a reasonable prospect of receiving compensation of substantial value at all times prior to December 5, 1961. That was the cut-off date and up until that time it was an open transaction.

In a recent case the Fifth Circuit reached the same conclusion on this issue on facts similar to the case at bar, Alvarez v. United States, 5 Cir., 431 F. 2d 1261 (1970). We quote with approval from page 1263:

> "In his claims for refund, Alvarez alleged that his interest in the property owned by him in Cuba had been taken on December 5, 1961, after he had become a resident alien, and that this loss was deductible under Section 165 of the Internal Revenue Code of 1954 as a loss of property used in his trade or business and that he was entitled to a net operating loss carryover

to 1962 and 1963. The Government contends that if there was a loss, it was sustained by Alvarez before he became a resident alien and it is therefore not an allowable loss within the meaning of Section 165 of the Internal Revenue Code. The Government takes the position that because of the difficulties which Alvarez would encounter in realizing upon his right to indemnification after leaving Cuba and before becoming a resident alien, he had lost the right which would have been open to him if he could have presented himself at his bank in Cuba to receive and cash the indemnification checks. If Alvarez sustained a loss of his Cuban property and property rights before he became a resident alien, the loss would not be allowable as a deduction.

> "Although it would have been necessary for Alvarez to return to Cuba in order to obtain and cash the indemnification checks issued to him and sent to his bank, the right existed and was recognized by the Cuban Government, which was performing its undertaking to make payments. The checks which had been issued were payable to him and the right of indemnification continued. There was not, in the existing situation, any condition or state of hopelessness of recovery so as to constitute, within the meaning of the tax law, a loss of his right to indemnification. See Estate of Fuchs v. Commissioner of Internal Revenue, 2d Cir. 1969, 413 F.2d 503; Colish v. Commissioner of Internal Revenue, 48 T.C. 711. At the time Alvarez became a resident alien he had, in our opinion, property rights consisting of the obligations of the Cuban Government in its promise of indemnification and in the checks which had been issued to him as payee and delivered to his bank in Cuba." (Footnotes omitted.)

## II

■ Assuming our determination of the issue in part I of this opinion to be correct, the Government then raises an

alternative issue which we now consider. This question is whether taxpayers' loss on December 5, 1961 was deductible only in the year incurred and could not be carried over to 1962 and 1963 as a net operating loss under § 172(b) (1) (D) of the 1954 Code.[6] Central to the resolution of this alternative issue is the determination of the nature or character of the property right the taxpayers lost on December 5, 1961.

It is clear that § 165(c) (3) is inapplicable to the subject confiscation losses since they did not "arise from fire, storm, shipwreck, or other casualty, or from theft." See, Powers v. Commissioner of Internal Revenue, 36 T.C. 1191 (1961); I.T. 4086, 1952–1 Cum.Bull. 29. No one appears to contend otherwise.

The Government contends that the losses of taxpayers' rights of indemnification on December 5, 1961, are allowable deductions only under § 165(c) (2), *supra*. Such deductions cannot be a part of a net loss carryover under § 172(a). See § 172(c) and (d) (4) of the 1954 Code, and § 1.172–3(a) (3), Treasury Income Tax Regulations (1954 Code), 26 C.F.R.

Taxpayers contend that the property lost as a result of Law 989 was taxpayers' rental real estate and such losses were therefore deductible under § 165(c) (1), *supra*, as losses incurred in a trade or business. It follows, they assert, that they sustained net operating loss deductions for 1961 under § 172(a) which can be carried forward for 10 years under § 172(b) (1) (D), *supra*.

As we have above held, on the effective date of October 14, 1960, under the Urban Realty Reform Law, "taxpayers were completely divested of their proprietary rights in or ownership of the two rental properties and there remained no right for them to recover the properties." All such rights in and to their rental real estate itself were gone.[7] The loss of their Cuban business realty became a closed transaction at that time and could not be deducted in the following year when taxpayers became resident aliens in the United States.

For these expropriated rental properties of which taxpayers were completely divested, they became entitled to and did receive compensation in the form of indemnity as hereinabove set out. It was from this indemnity that we held taxpayers possessed a reasonable prospect of receiving compensation of substantial value prior to December 5, 1961. It was the right of indemnification that remained an open transaction after taxpayers became United States resident aliens. The closed transaction related to business real estate. The right of indemnification was distinct therefrom and was a nonbusiness asset.

It was *real estate* that was held by taxpayers exclusively for rental purposes. They were engaged in the trade or business of operating such properties. There is no showing whatever that taxpayers held their rights of indemnification for business purposes or that taxpayers were engaged in the trade or business of dealing in them. We have carefully considered the various regulations and cases cited as applicable to analogous situations in support of taxpayers' theory that the loss which may

---

6. § 172(b) (1) (D) reads:
   "(b) Net Operating Loss Carrybacks and Carryovers.—
   "(1) Years to which loss may be carried.—
   \* \* \*
   "(D) In the case of a taxpayer which has a foreign expropriation loss (as defined in subsection (k)) for any taxable year ending after December 31, 1958, the portion of the net operating loss for such year attributable to such

foreign expropriation loss shall not be a net operating loss carryback to any taxable year preceding the taxable year of such loss and shall be a net operating loss carryover to each of the 10 taxable years following the taxable year of such loss."

7. Cf., Bosch v. Commissioner, T.C.Mem. 1970–66, 29 CCH Tax Ct.Mem. 284, 292 (1970).

be deducted here is the loss of the underlying property, the rental real estate. We cannot accept this rationale as controlling in the instant case.

We, therefore, conclude that the property lost by taxpayers was not their real estate, but rather was the right of indemnification, a nonbusiness asset, not used in a trade or business. Accordingly, taxpayers sustained no loss incurred in a trade or business on December 5, 1961 and would have no "net operating loss" capable of being carried forward through 1962 and 1963. Alvarez v. United States, *supra*, 431 F.2d at 1263–1265. We hold that the district court erred in its contrary findings and opposite conclusions. We do not reach or pass upon other questions presented.

The judgment of the district court is reversed and this cause is remanded for entry of an appropriate judgment consistent with this opinion.

Reversed and remanded.