**Luis and Alicia P. BOSCH, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 30152.**

United States Court of Appeals, Fifth Circuit.

May 28, 1971.

Stanley Schoenbaum, San Antonio, Tex., Michael Waris, Jr., Washington, D. C., Schoenbaum & Cluck, San Antonio, Tex., Eugene A. Theroux, Baker & McKenzie, Washington, D. C., for petitioners-appellants.

Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Elmer J. Kelsey and Robert D. Bickel, Attys., Tax Div., Dept. of Justice, K. Martin Worthy, Chief Counsel, I. R. S., Leonard J. Herzke, Jr., Atty., Dept. of Justice, Tax Div., Washington, D. C., for respondent-appellee.

Before GOLDBERG and DYER, Circuit Judges, and GROOMS, District Judge.

GROOMS, District Judge:

This action involves deficiencies in federal income taxes for the year ending January 31, 1964, in the amount of $726.98 and for the year ending January 31, 1965, in the amount of $7,646.85, and a claim for refund of an alleged overpayment of $2,236.13 for the year ending January 31, 1964.

Appellants Luis and Alicia P. Bosch, husband and wife, are Cuban nationals and filed joint returns for the years involved. Prior to October 14, 1960, they lived in Cuba. The husband owned two rental properties and a twenty percent partnership interest in a textile manufacturing business known as Bosch-Carrio y Cia. On the date referred to the Cuban government, effective October 15, 1960, intervened all urban rental properties under the Urban Realty Reform Law. By this Act appellant Luis Bosch, hereinafter referred to as appellant, was divested of his two rental properties.

The decree of intervention promised indemnification under a formula based upon the construction or acquisition date of the property and the amount of rental income therefrom. One of the properties was an office building located in Havana. Appellant's adjusted basis in the land and building on October 14, 1960, was $110,800 United States dollars. The other property was an apartment building also located in Havana with an adjusted basis of $38,600 United States dollars. The fair market value of the properties was no less than their adjusted bases.

Had appellant met all the provisions required for indemnification he would have been entitled to $570 peso dollars[1] per month for fifteen years, or a total of $80,267 United States dollars.

To be entitled to indemnification the property owner had to be a resident of Cuba at the time of filing his claim and at the time of receiving each of his monthly payments. Appellant never filed a claim for indemnification, has received no income from the properties and has exercised no control over their operation or use since the intervention decree was entered.

Effective October 15, 1960, the Cuban government entered a decree of intervention taking over a substantial number of major businesses, including Bosch-Carrio y Cia. Appellant's interest in the partnership at that time amounted to $146,860 United States dollars. Appellant has received no income from nor exercised any control over the business since the decree became effective.

Article 7 of the decree provides that the measure and forms for the payment of indemnity "will be regulated by a future law," which the Central Planning Council would place before the Council of Ministers. No such indemnification law has been enacted.

On October 24, 1960, appellants departed Cuba under an exit permit of October 21, 1960. They entered the United States on the 24th under a visa dated July 10, 1958, valid for a four-year period. They have lived here as resident aliens under a refugee status. Neither of them has returned to Cuba. When they arrived they had no intention of returning until there was a change in "the political climate in that country." Appellant has actively opposed the political and social regime of Fidel Castro. However, under his exit permit he could have returned to Cuba at any time during 1960 or 1961.

On December 6, 1961, the Cuban government published a decree providing

---

1. The rate of exchange in 1960 was one United States dollar for one peso dollar.

for total confiscation of all property of whatever nature in Cuba owned by Cuban nationals who had left Cuba and who did not return in the time granted them in their exit permits. This decree was enacted as "Law No. 989." It provided that there would be no indemnification for confiscation thereunder and extinguished any right to indemnification granted under the prior decree.

In addition to the rental properties and the partnership interest Law No. 989 also rendered valueless appellant's F.H.A. Cuban bond, having a cost of $5,000 peso dollars, and ten shares of corporate stock of a like cost.

This case was presented to the Tax Court on the issue of whether the loss was sustained on October 15, 1960, while appellant was a resident and citizen of Cuba, or on December 6, 1961, when Law No. 989 became effective at which time appellant resided in the United States. The court's ruling was adverse to the appellant and held that he had not shown that at any time after he became a resident alien of the United States he had a subsisting right with respect to which there was a reasonable prospect of recovery. Treas.Reg. § 1.165–1(d) (2) (i).[2] The Tax Court's decision was rendered on March 17, 1970.

On September 1, 1970, this Court rendered its decision in Alvarez v. United States, 431 F.2d 1261, cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812, 1971. That decision has now brought into this case the issue as to whether the losses incurred by appellant were "incurred in a trade or business," and deductible under Section 165 of the Internal Revenue Code of 1954. 28 U.S.C.A. § 165(a) and (c) (1),[3] and as such whether appellant was entitled to a net operating loss carryover under 26 U.S.C.A. § 172(b) (1) (D).[4] If Alvarez rules the issue now presented, we need not decide the other issue. In Alvarez we stated:

"At the time when the Cuban Government took the rented real property of Alvarez, he was divested of trade or business property and for this property there was substituted the non-interest bearing obligation of the Cuban Government. There was a conversion of one kind of property into that of another kind. All of the characteristics of finality were present. No profit could have resulted from the ownership of the right of indemnification. Thus the loss sustained does not meet the profit motive test to qualify it as a trade or business loss. See 5 Mertens, Law of Federal Income Taxation, § 28.–31, 130–31. The Cuban promise of indemnification was an obligation for the payment of money, nothing more or less. The obligation received did not have the trade or business attributes of the property for

---

2. The regulation provides:
   "If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received."

3. The relevant portions of this section of the Code provide as follows:
   "(a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \*

   "(c) Limitation on losses of individuals. —In the case of an individual, the deduction under subsection (a) shall be limited to—
   (1) Losses incurred in a trade or business \* \* \*"

4. "(D) In the case of a taxpayer which has a foreign expropriation loss (as defined in subsection (k)) for any taxable year ending after December 31, 1958, the portion of the net operating loss for such year attributable to such foreign expropriation loss shall not be a net operating loss carryback to any taxable year preceding the taxable year of such loss and shall be a net operating loss carryover to each of the 10 taxable years following the taxable year of such loss."

which it was received even though the conversion was involuntary. The trade or business attribute cannot attach to the right of indemnification by the application of a doctrine of relation back to the trade or business property for which the indemnification was given. * * * [T]he confiscation of the right of indemnification and other intangibles was related to the earlier taking only in that the fruit of the first was the subject of the second. This is not enough."

*Alvarez* is now buttressed by the decision of the Seventh Circuit of April 6, 1971, 441 F.2d 954, on the appeals of the consolidated suits of Beltran v. United States, 69–2 U.S.Tax Cas.Par. 9649 (N. D.Ill.), and Onetti v. United States, *Id.* The Seventh Circuit stated:

"It was the right of indemnification that remained an open transaction after taxpayers became United States resident aliens. The closed transaction related to business real estate. The right of indemnification was distinct therefrom and was a nonbusiness asset.

"It was real estate that was held by taxpayers exclusively for rental purposes. They were engaged in the trade or business of operating such properties. There is no showing whatever that taxpayers held their rights of indemnification for business purposes or that taxpayers were engaged in the trade or business of dealing in them. We have carefully considered the various regulations and cases cited as applicable to analogous situations in support of taxpayers' theory that the loss which may be deducted here is the loss of the underlying property, the rental real estate.

We cannot accept this rationale as controlling in the instant case.

"We, therefore, conclude that the property lost by taxpayers was not their real estate, but rather was the right of indemnification, a nonbusiness asset, not used in a trade or business. Accordingly, taxpayers sustained no loss incurred in a trade or business on December 5, 1961 and would have no 'net operating loss' capable of being carried forward through 1962 and 1963. Alvarez v. United States, supra, 431 F.2d at 1263–1265."

Under the Urban Realty Reform Law appellant was deprived of all control and use of his property. He was stripped of all proprietary right with no right of recovery of the property. Literally, the Law "put him him out of business," and substituted for the property taken a promise to pay. That was all that remained to him. The existence of the right was not predicated on the filing of the declaration but its enjoyment was. The right was the matter that counted value-wise. In *Alvarez* the right was exercised. Here it remained unexercised but was an existing right nevertheless. Under his exit permit appellant could have returned and exercised his right of indemnification by filing a declaration.[5] Since "no profit could have resulted from the ownership of the right of indemnification" [*Alvarez*], we can see no difference whether the right was exercised or not. We therefore conclude that the rationale of *Alvarez* on this issue governs this case.

The decision will, therefore, be affirmed.

Affirmed.

5. The Law contained no provision for the cut-off or forfeiture of rights for failure to file a declaration of properties by any prescribed date. By Article 7 "Provisional Urban Reform Boards" were created tentatively. There was also established with permanent character a "Superior Urban Reform Council." These bodies were to handle all questions of a civil or social nature arising from the operation of the law. The former were to settle all questions referred to them within one year, after which they were to be abandoned. There was no such limitation as to the latter.