ARMANDO MENDEZ and MARGARITA MENDEZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mendez v. Commissioner
Docket No. 3545-68.
United States Tax Court
T.C. Memo 1973-137; 1973 Tax Ct. Memo LEXIS 152; 32 T.C.M. (CCH) 658; T.C.M. (RIA) 73137; June 25, 1973, Filed Robert J. Carluccio, for the petitioners. Kimball K. Ross, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Year
Amount 1964
$974.22
1965
1,033.46 2 The sole issue for our decision is whether petitioners were entitled to net operating loss deductions under section 172 [1] in 1964 and 1965 in respect of losses *153 they incurred prior to such years by reason of confiscation of certain assets by the government of Cuba. FINDINGS OF FACT Some of the facts were stipulated and are so found. Petitioners Armando Mendez (hereinafter referred to as petitioner) and Margarita Mendez are husband and wife who, at the time they filed their petition herein, resided in Brooklyn, New York. They filed their joint Federal income tax returns for the taxable years 1964 and 1965 with the district director of internal revenue, Brooklyn, New York. Prior to 1961, petitioners were Cuban nationals residing in Havana, Cuba. In 1957 petitioner's father died and, pursuant to his father's will, he inherited the following assets: 1. One-third interest in rental property located at Alambique Street, Havana, Cuba (the Alambique property); 2. Rental property located at 1058 Eleventh Street, Havana, Cuba (the Eleventh Street property); 3. One-third interest in the uncollected balance of a $60,000 (Cuban currency) debt owed to Armando's father from 3 Maderas Mendez y Compania, S.A. (the Maderas *154 Company). The Alambique property consisted of 12 apartments plus a ground floor which was used commercially. Petitioner managed this property for himself and on behalf of his sister and brother, who had inherited the remaining two-thirds interest in the property. The Eleventh Street property consisted of eight apartments, which petitioner also managed. Pursuant to his father's will, petitioner paid his niece $20,000 (Cuban currency) so that he would be the sole owner of the Eleventh Street property. The debt petitioner inherited arose when his father sold an interest in the Maderas Company in 1954. The payment of the sales price was to be made at the rate of $10,000 (Cuban currency) per year for six years. Petitioner estimated that in 1960 the balance owed on this debt was $20,000 (Cuban currency). No further payments were ever made. On October 14, 1960, the Cuban Government enacted the Urban Realty Reform Law, which took away from the owners almost all urban rental property, including petitioner's two apartment buildings. The law gave occupying tenants the right to purchase ownership of their apartments, and promised indemnification to the former owners in an amount *155 determined 4 by a formula which took into account the age and rental value of the property. In order to obtain indemnification, owners of rental property were required only to file a declaration listing the rental property they owned. Petitioner made the required declaration, began receiving monthly payments, and ceased to exercise any control over his property. He was promised indemnification in the approximate amounts of $16,634.80 (Cuban currency) for his one-third interest in the Alambique property, and $16,261 (Cuban currency) for the Eleventh Street property. The indemnification was to be paid in monthly installments over the period of 84 months. Petitioner's calculations were made entirely from his recollection because he was unable to bring any business records or other documents of substantiation with him from Cuba. On September 13, 1961, petitioner left Cuba and came to the United States to join his wife who had left Cuba in March 1961. Prior to leaving Cuba, he had received monthly payments of the two apartment buildings in the total amount of $3,132.98 (Cuban currency). After departing Cuba, he received no further monthly payments for his two properties. *156 Though petitioner had no intention of returning as long as the Castro regime remained 5 in power, his exit permit allowed him either 30 or 60 days within which to return to Cuba. On December 5, 1961, the Cuban Government enacted Law No. 989 which provided for the total confiscation of all Cuban properties owned by Cuban nationals who failed to return to Cuba within a designated time. Because petitioner's exit permit had expired prior to the enactment of this law, he lost all his property in Cuba, including indemnification rights, on this date. At all relevant times the official exchange rate in Cuban pesos per United States dollar was one to one. The free market or commercial exchange rate at the end of November and at the end of December of 1961 was 5.35 and 5.50 pesos per one U. S. dollar, respectively. Petitioners did not claim any losses when they filed their 1961 joint Federal income tax return. However, on April 16, 1965, they filed an amended return for 1961 wherein they claimed a total loss of $66,666.66. The claimed loss consisted of the two apartment buildings and the debt obligation petitioner had inherited from his father. 6 Petitioners filed joint *157 Federal income tax returns for the years 1962 through 1965. Only on their returns for 1964 and 1965 did they claim deductions in respect of the Cuban loss. The following table presents a summary of the relevant information in petitioners' tax returns for the years 1961 through 1965: Year
Gross Income Reported
Taxable Income Per Return
Net Operating Loss Claimed on Return 1961
$ 986.32
-O-
-O-
1962
5,948.85
*
-0-
1963
7,454.00
4,908.60
-0-
1964
8,079.00
-0-
52,987.69
1965
9,045.99
-0-
45,605.39
In his notice of deficiency to petitioners for each of the years 1964 and 1965, respondent disallowed the claimed carryover net operating loss deductions. The petitioners reduced their claimed loss from $66,666.66 in their petition filed herein and now claim losses as follows: 7 Claimed Loss
Date of Confiscation
Amount Lost Indemnification Payments - Alambique Property
Dec. 5, 1961
$15,050.56
Lost Indemnification Payments - Eleventh Street Property
Dec. 5, 1961
14,712.36
Debt Due from Maderas Company
Dec. 5, 1961
6,666.67
$36,429.59
*158 OPINION Petitioners contend that as a result of losses sustained on December 5, 1961, by reason of the confiscation of their Cuban assets, they are entitled to net operating loss deductions in 1964 and 1965 under the carryover provisions of section 172. We hold that petitioners are not entitled to their claimed deduction because their alleged loss is not in an amount sufficient to produce a deduction for 1964 or 1965. Petitioners claim losses in the total amount of $36,429.59. While their claim is based largely on petitioner's recollections this is not fatal to their case in view of the circumstances. Cf. Andrew P. Solt, 19 T.C. 183, 188-189 (1952); Benjamin Abraham, 9 T.C. 222, 226 (1947). We are of the opinion that petitioner was an honest and credible witness, and note that he had extensive knowledge of the seized assets, having formerly managed the seized properties and having filed the indemnification claims. Nevertheless, even if we fully accept petitioners' 8 testimony, they are not entitled to the deduction. Petitioners' claimed loss represents seized Cuban obligations which were payable in "pesos" not dollars, and although a peso *159 was equal to a dollar under the "official" exchange rate, its "free" market value was far less favorable. The "free" market rather than the "official" market establishes petitioners' loss for Federal income tax purposes. See Marko Durovic, 54 T.C. 1364, 1388-90 (1970) and cases there cited. The parties have stipulated that on December 5, 1961, the date petitioners claim they suffered their loss, the "free" exchange rate was between 5.35 and 5.50 pesos per one U. S. dollar. Accordingly, using the rate most favorable to petitioners, their claimed loss must be reduced from $36,429.59 to $6,810 (rounded). [2]
Section 172(b) (2) requires that the net operating loss shall be carried to the earliest allowable taxable year. Petitioners' taxable income for 1963 was $4,908.60. They did not compute their taxable income on their income tax return for 1962. However, in the absence of any evidence of unusually 9 large deductions for 1962, we have *160 found as a fact that petitioners' taxable income for 1962 was at least $3,000. It is therefore clear that any loss sustained by petitioners in respect of their Cuban properties would have been absorbed by their taxable income in 1962 and 1963, and therefore no loss remains to be carried over to 1964 or 1965. Ellery Willis Newton, 57 T.C. 245 (1971). Because we have held that petitioners' claimed loss was in an amount insufficient to generate a carryover loss to 1964 or 1965, we need not consider whether their loss otherwise qualifies as a net operating loss under section 172.Cf. Bosch v. Commissioner, 448 F.2d 1026 (1971), affirming a Memorandum opinion of this Court, and cases cited. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified. ↩
*. In 1962 petitioners used the optional tax tables and therefore did not compute their taxable income on their return. However taxable income for 1962 was at least $3,000. ↩
2. Further reductions of this amount would be needed to arrive at an actual net operating loss as defined by section 172. Sec. 172(c) and (d). We have not made such reductions as they are not necessary to our decision. ↩